## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

CARL BLEAKNEY, individually and
on behalf of all others similarly situated,

               Plaintiff,

     v.

PHILIPS RS NORTH AMERICA LLC,

           Defendant.

Case No. 2:21-cv-1188

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Carl Bleakney, individually and on behalf of all others similarly situated, bring this action against Defendant Philips RS North America LLC ("Philips") and alleges the following based on personal knowledge, information and belief, and the investigation of counsel.

## NATURE AND SUMMARY OF THE ACTION

1.     Plaintiff brings this action on behalf of himself and a proposed class of purchasers and users of Continuous Positive Airway Pressure (CPAP) and Bi-Level Positive Airway Pressure (Bi-Level PAP) devices and mechanical ventilators manufactured by Philips, which contain polyester-based polyurethane sound abatement foam ("PE-PUR Foam").

2.     On April 26, 2021, Philips made a public announcement disclosing it had determined there were risks that the PE-PUR Foam used in certain CPAP, Bi-Level PAP, and mechanical ventilator devices it manufactured may degrade or off-gas under certain circumstances.

3.     On June 14, 2021, Koninklijke Philips N.V. ("Royal Philips") issued a recall in the United States of its CPAP, Bi-Level PAP, and mechanical ventilator devices containing PE-PUR Foam, because Philips had determined that (a) the PE-PUR Foam was at risk for degradation into

particles that may enter the devices' pathway and be ingested or inhaled by users, and (b) the PE-PUR Foam may off-gas certain chemicals during operation. *See* Philips Recall Notice attached hereto as Exhibit "A."

4.      Philips further disclosed in its Recall Notice that "these issues can result in serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment." *Id.*

5.      Philips has disclosed that the absence of visible particles in the devices does not mean that PE-PUR Foam breakdown has not already begun. Philips reported that lab analysis of the degraded foam reveals the presence of harmful chemicals, including: Toluene Diamine ("TDA"), Toluene Diisocyanate ("TDI"), and Diethylene Glycol ("DEG").[1]

6.      Prior to issuing the Recall Notice, Philips received complaints regarding the presence of black debris/particles within the airpath circuit of its devices (extending from the device outlet, humidifier, tubing, and mask). Philips also received reports of headaches, upper airway irritation, cough, chest pressure and sinus infection from users of these devices.

7.      In its Recall Notice, Philips disclosed that the potential risks of particulate exposure to users of these devices include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic affects. The potential risks of chemical exposure due to off-gassing of PE-PUR Foam in these devices include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

---

[1] Philips, *Sleep and Respiratory Care Update; Clinical information for physicians*, June 14, 2021, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (last visited Aug. 2, 2021).

8.    Philips recommended that patients using the recalled CPAP and Bi-Level PAP devices immediately discontinue using their devices and that patients using the recalled ventilators for life-sustaining therapy consult with their physicians regarding alternative ventilator options.

9.    In 2018, Plaintiff purchased a DreamStation Auto BiPAP machine he has used nightly since.

10.    In 2021, Plaintiff learned the Philips' DreamStation Auto BiPAP device may be subject to a recall due to the presence of a dangerous PE-PUR Foam that could cause Plaintiff to suffer from adverse health effects, including, *inter alia*, cancer and organ failure.

11.    Plaintiff was advised to verify whether the device was subject to the recall by submitting its serial number to an online database Philips established.

12.    Plaintiff received confirmation from Philips' online database that the DreamStation Auto BiPAP device was subject to recall.

13.    Because immediately stopping his use of the DreamStation would pose a serious medical risk, Plaintiff was advised to continue using the recalled DreamStation until he received a replacement from Philips' recall program or until he purchased a replacement.

14.    Because Philips has failed to replace the recalled DreamStation in a timely manner, Plaintiff and his wife are planning to purchase a replacement on their own. Plaintiff and his wife are budgeting approximately $2,500 for this replacement.

15.    Plaintiff has incurred substantial expenses related to the DreamStation Auto BiPAP device that Plaintiff would not have incurred had he known of the adverse health effects described above because Plaintiff would not have purchased the DreamStation Auto BiPAP device and the equipment used with it had he known of these adverse health effects.

16.     In addition, Plaintiff has experienced chest tightness and respiratory irritants during his use of the Philips' DreamStation Auto BiPAP device. Since being notified of the recall, Plaintiff has experienced anxiety concerning the potential serious health risks he is facing from possible exposure to offgassed or degraded PE-PUR Foam in the recalled device.

17.     Plaintiff seeks to recover damages based on, inter alia, Philips' breach of express warranty, breach of implied warranties, misrepresentations, omissions, and breach of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-1-201-9.2 in connection with Philips' manufacture, marketing and sales of devices containing PE-PUR Foam on behalf of himself and the proposed Class.

18.     Plaintiff also seeks medical monitoring damages for users of Philips' devices identified in the Recall Notice, who are at risk of suffering from serious injury, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (e.g., kidneys and liver) and toxic carcinogenic affects.

## PARTIES

19.     Plaintiff Carl Bleakney is a natural person over the age of eighteen. He resides in Pennsylvania.

20.     Defendant Philips is a Delaware limited liability company with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15206. Philips is a wholly-owned subsidiary of Royal Philips. Philips was formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.[2]

---

[2] *Philips announces completion of tender offer to acquire Respironics*, WEB WIRE, https://www.webwire.com/ViewPressRel.asp?aId=61199 (last visited Aug. 2, 2021).

## PRELIMINARY ALLEGATIONS

### I.    Continuous Positive Airway Pressure Therapy

21.    Continuous Positive Airway Pressure ("CPAP") therapy is a common nonsurgical treatment primarily used to treat sleep apnea. CPAP therapy typically involves the use of a hose and a nasal or facemask device that delivers constant and steady air pressure to an individual's throat to help individuals breathe.

22.    Sleep apnea is a common sleep disorder characterized by repeated interruptions in breathing throughout an individual's sleep cycle. These interruptions, called "apneas," are caused when the soft tissue in an individual's airway collapses. The airway collapse prevents oxygen from reaching the individual's lungs which can cause a buildup of carbon dioxide. If the individual's brain senses the buildup of carbon dioxide, it will briefly rouse the individual from sleep so that the individual's airway can reopen. Often these interruptions are so brief that the individual will not remember. Despite the brevity of the interruptions, the sleep cycle disruption caused by sleep apnea can dramatically impact a person's lifestyle, including negatively impacting energy, mental performance, and long-term health. CPAP therapy helps treat sleep apnea by preventing the person's airway from collapsing while breathing during sleep cycles, which can help prevent interruptions in breathing.

### II.    Bi-Level Positive Airway Pressure Therapy

23.    Bi-Level Positive Airway Pressure ("BiPAP") therapy is a common alternative to CPAP therapy for treating sleep apnea. Similar to CPAP therapy, BiPAP therapy is nonsurgical

and involves the use of a nasal or facemask device to maintain air pressure in an individual's airway.

24.    BiPAP therapy is distinguishable from CPAP therapy, however, because Bi-Level PAP devices deliver two alternating levels—inspiratory and expiratory—of pressurized air into a person's airway, rather than the single continuous level of pressurized air delivered by a CPAP device.

25.    The inspiratory positive airway pressure assists a person as a breath is taken in. Conversely, the expiratory positive airway pressure is applied to allow a person to comfortably breathe out. Bi-Level PAP devices deliver one level of pressurize air (the inspiratory positive level) to assist as a person inhales, and another level (the expiratory level) as a person exhales.

**III.    Mechanical Ventilation**

26.    Mechanical ventilation is a treatment to help a person breathe when they find it difficult or are unable to breathe on their own.

27.    A mechanical ventilator pushes airflow into the patient's lungs to help them breathe. Mechanical ventilation may be invasive ventilation with a tube inserted into the patient's airway, performed in the intensive care unit in the hospital or a long-term institutional setting.

28.    Non-invasive ventilation can be used at home by people with respiratory difficulties.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

29.    Philips developed, marketed, and sold a variety of CPAP and Bi-Level PAP respirator devices and mechanical ventilators under its "Sleep & Respiratory Care" segment of its business designed to assist individuals with a number of sleep, breathing, and respiratory

conditions, including obstructive sleep apnea, central sleep apnea, complex sleep apnea syndrome, and Chronic Obstructive Pulmonary Disease (COPD), as well as to assist those individuals requiring invasive and non-invasive ventilators for acute and sub-acute hospital environments.

30.     Philips' CPAP and Bi-Level PAP respirator devices and its mechanical ventilators typically cost several hundred, if not thousands of dollars.

31.     Philips has sold millions of these devices in the United States.

### I.     Philips Sleep & Respiratory Care Devices Endangered Users

32.     On April 26, 2021, in its Quarterly Report for Q1 2021, Philips disclosed for the first time, under a section entitled "Regulatory Update," that device user reports had led to a discovery that the type of PE-PUR Foam Philips used to minimize noise in several CPAP and Bi Level PAP respirators and mechanical ventilators posed health risks to its users.

33.     Philips disclosed that "the [PE-PUR] foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone[], and certain environmental conditions involving high humidity and temperature."[3]

34.     Seven weeks later, on June 14, 2021, Philips announced a recall of numerous models of CPAP and Bi-Level PAP devices, as well as a variety of its mechanical ventilators "to address identified potential health risks related to the polyester-based polyurethane (PE-PUR) sound abatement foam component in these devices."[4]

---

[3]     *First    Quarter    Results*,    Philips    (Apr.    26,    2021), https://www.results.philips.com/publications/q121/downloads/pdf/en/philips-first-quarter-results-2021-report.pdf (last visited Aug. 2, 2021).
[4]     *Philips issues recall notification\* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices*, PHILIPS (June 14, 2021),    https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-

35.    Philip announced that it had determined that the "PE-PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals."[5]

36.    In total, Philips announced that "[b]etween 3 million and 4 million" devices are targeted in the recall.[6]

37.    The list of the devices recalled by Philips (the "Recalled Devices") include:

| Philips CPAP and Bi-Level PAP Devices Manufactured Before April 26, 2021 Subject to Recall[7] | |
|---|---|
| **Device Name/Model Type** | **Type** |
| • E30 (Emergency Use Authorization) | Continuous ventilator; minimum ventilatory support, facility use |
| • DreamStation ASK<br>• DreamStation ST, AVAPS<br>• SystemOne ASV4<br>• C Series ASV<br>• C Series S/T and AVAPS<br>• OmniLab Advanced Plus | Continuous ventilator; non-life supporting |
| • SystemOne (Q Series)<br>• DreamStation<br>• DreamStation GO<br>• Dorma 400 | Non-continuous Ventilator |

---

abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (last visited Aug. 2, 2021).

[5] *Id.*

[6] Associated Press, *Philips recalls ventilators, sleep apnea machines due to health risks*, NBC NEWS, https://www.nbcnews.com/business/consumer/philips-recalls-ventilators-sleep-apnea-machines-duehealth-risks-n1270725 (last visited Aug. 2, 2021).

[7] Recall Notice (Exhibit "A" hereto); *see also* Medical Device recall notification (U.S. only) / field safety notice (International Markets), PHILIPS RESPIRONICS (June 14, 2021), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2 (accessed Aug. 2, 2021); Royal Philips Update on the recall notification, https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (last Aug. 2, 2021).

| | |
|---|---|
| • Dorma 500<br>• REMStar SE Auto | |
| **Philips Mechanical Respirator Devices**<br>**Manufactured Before April 26, 2021 Subject to Recall[8]** | |
| **Device Name/Model Type** | **Type** |
| • Trilogy 100 Ventilator<br>• Trilogy 200 Ventilator<br>• Garbin Plus, Aeris, LifeVent Ventilator | Continuous ventilator |
| • A-Series BiPAP Hybrid A30<br>• Philips A-Series BiPAP V30 Auto | Continuous ventilator, minimum ventilatory support, facility use |
| • Philips A-Series BiPAP A40<br>• Philips A-Series BiPAP A30 | Continuous ventilator, non-life supporting |

38.     According to Philips, the PE-PUR Foam used in Recalled Devices puts users at risk of suffering from: "[i]rritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.* kidneys and liver) and toxic carcinogenic affects."[9]

39.     Philips reported to physicians that PE-PUR Foam particles "may cause irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve."

40.     Further, Philips reported that "based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment."

---

[8] *Id.*

[9] *Id.*

41.     Philips announced that it has received reports of specific complaints from users of Recalled Devices who suffered from "headache[s], upper airway irritation, cough, chest pressure and sinus infection."[10]

## II.     The Health Risks Associated with Use of the Recalled Devices Renders Them Worthless

42.     As a result of the health risks associated with the use of the Recalled Devices, together with Philips' concealment of these risks from the date they were first reported to Philips' or discovered by Philips through April 26, 2021, the Recalled Devices have been rendered completely worthless or, at the very least, have been substantially diminished in value.

43.     The information described above, including the now-known health risks of Philips' CPAP devices, Bi-Level PAP devices and mechanical ventilators, the recall, and the medical warnings and advice issued by Philips, have rendered the Recalled Devices worthless to patients with sleep apnea and respiratory conditions.

44.     Individuals not using life-supporting ventilators must immediately discontinue their use of the Recalled Devices or face serious health risks as grave as organ failure or cancer.

45.     If they choose to discontinue use of the Recalled Devices they must pay for another expensive device in order to receive effective treatment for their sleep apnea and/or respiratory conditions.

46.     Individuals using life-supporting ventilators must seek an alternative treatment before discontinuing use of the Recalled Devices.

---

[10] Recall Notice (Exhibit A hereto).

47.    Recognizing this, Philips issued the following advice to patients using any of the Recalled Devices:

- "**For patients using BiLevel PAP and CPAP devices:** Discontinue use of affected units and consult with physicians to determine the benefits of continuing therapy and potential risks."[11]

- "**For patients using life-sustaining mechanical ventilator devices: DO NOT discontinue or alter prescribed therapy, without consulting physicians to determine appropriate next steps.**"[12]

**III.    Philips Unreasonably Delayed its Recall**

48.    At no time prior to its Regulatory Update on April 26, 2021, did Philips disclose to purchasers or users of the Recalled Devices that the PE-PUR Foam contained therein may offgas or degrade upon use.

49.    Prior to the Update, Philips did not disclose any health risks associated with use of the Recalled Devices.

50.    Philips has not disclosed when they first discovered or received reports from users of their Sleep & Respiratory Care devices "regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)."[13]

51.    At a minimum, as a result of user reports, Defendant was aware of the offgassing and degradation of the PE-PUR Foam used in the Recalled Devices at some point prior to the recall, yet continued to manufacture and sell the Recalled Devices with such awareness.

---

[11] Medical Device recall notification (U.S. only) / field safety notice (International Markets), PHILIPS RESPIRONICS (June 14, 2021), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2 (last visited Aug. 2, 2021) (Questions and answers) (emphasis in original).
[12] *Id.*
[13] Recall Notice (Exhibit "A" hereto).

52.     During this period, Defendant unreasonably and unjustly profited from the manufacture and sale of the Recalled Devices and unreasonably put users of the Recalled Devices at risk of development of serious adverse health effects, including organ failure and cancer.

**IV.    Facts Relevant to Plaintiff**

53.     Plaintiff is a resident of Pennsylvania.

54.     In 2018, Plaintiff purchased a Recalled Device, the DreamStation Auto BiPAP machine.

55.     The manuals accompanying the Respironics DreamStation device did not contain any language or warnings of health risks associated with use of the device, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects.

56.     Had Philips informed Plaintiff of these risks, he would not have purchased or used the Recalled Device.

57.     Without knowing of the health risks associated with use of the Recalled Devices, Plaintiff used the DreamStation regularly to treat his atrial flutter and sleep apnea.

58.     Plaintiff consulted his doctor after learning of the health risks associated with the Recalled Devices.

59.     Plaintiff's doctor instructed him to buy a new Bi-Level PAP device, or continue using his current DreamStation because the alternative—not using any Bi-Level PAP machine— would be too great a risk to Plaintiff's health.

60.     Because Philips has failed to replace the recalled DreamStation in a timely manner, Plaintiff and his wife are planning to purchase a replacement on their own. Plaintiff and his wife are budgeting approximately $2,500 for this replacement.

61.     Until then, Plaintiff does not have any choice but to continue using the recalled DreamStation.

62.     Still, the DreamStation device is now worthless.

## TOLLING AND ESTOPPEL

### I.     Discovery Rule Tolling

63.     Plaintiff and the Class had no way of knowing about Philips' conduct with respect to the health risks associated with the use of the Recalled Devices.

64.     Neither Plaintiff nor any other members of the Class, through the exercise of reasonable care, could have discovered the conduct by Philips alleged herein.

65.     Further, Plaintiff and members of the Class did not discover and did not know of facts that would have caused a reasonable person to suspect that Philips was engaged in the conduct alleged herein.

66.     For these, reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiff and the Class.

### II.     Fraudulent Concealment Tolling

67.     By failing to provide immediate notice of the adverse health effects associated with continued use of the Recalled Devices, Philips concealed its conduct and the existence of the claims asserted herein from Plaintiff and the members of the Class.

68.     Upon information and belief, Philips intended its acts to conceal the facts and claims from Plaintiff and members of the Class.

69.     Plaintiff and the members of the Class were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Philips' conduct.

70.     For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiff and the members of the Class should be tolled.

## CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action individually and on behalf of all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure.

72.     Plaintiff seeks to certify the following Class: "All Pennsylvania citizens who are domiciled in Pennsylvania and who purchased and used a CPAP, Bi-Level PAP, or Mechanical Ventilator device that was manufactured by Philips before April 26, 2021, and recalled by Philips on June 14, 2021."

73.     Plaintiff reserves the right to expand, narrow, or otherwise modify the Class as the litigation continues and discovery proceeds.

74.     Fed. R. Civ. P. 23(a)(1): The Class is so numerous that joinder is impracticable. Since each of the claims of the Class Members is substantially identical, and the Class Members request substantially similar relief, centralizing the Class Members' claims in a single proceeding likely is the most manageable litigation method available.

75.     Fed. R. Civ. P. 23(a)(2) and 23(b)(3): Plaintiff and each Member of the Class share numerous common questions of law and fact that will drive the resolution of the litigation and

predominate over any individual issues. For example, there is a single common answer to the question of whether Defendant knew or should have known that the PE-PUR Foam used for sound abatement posed health risks. The answer to this question is the same for Plaintiff and each Member of the Class, and Plaintiff and each Member of the Class require the same proof to answer this question. This question, and other common questions of law and fact, predominate over any individual issues.

76.    <u>Fed. R. Civ. P. 23(a)(3)</u>: Plaintiff's claims are typical of the claims of each Member of the Class because the claims are based on the same legal theories and arise from the same conduct.

77.    <u>Fed. R. Civ. P. 23(a)(4)</u>: Plaintiff is an adequate representative of each Member of the Class because the interests of Plaintiff and each Member of the Class align. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of each Member of the Class and has no interest antagonistic to any Member of the Class. Plaintiff retained counsel who are competent and experienced in the prosecution of class action litigation.

78.    <u>Fed. R. Civ. P. 23(b)(3)</u>: Given the complexity and nature of the issues presented and the relief requested, the expense and time necessary to obtain such relief, and the anticipated recovery and relief that Plaintiff and each Member of the Class may obtain, the class action mechanism is by far the preferred and most efficient litigation mechanism to adjudicate the claims of Plaintiff and each Member of the Class. Additionally, requiring Plaintiff and each Member of the Class to file individual actions would impose a crushing burden on the court system. Class treatment presents far fewer management difficulties and provides benefits of a single adjudication and economies of scale.

79.     Fed. R. Civ. P. 23(b)(2): Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

80.     Class certification is appropriate under Rule 23 of the Federal Rules of Civil Procedure because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF EXPRESS WARRANTY

81.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

82.     Philips marketed and sold the Recalled Devices into the stream of commerce with the intent that the Recalled Devices would be purchased by Plaintiff and the Class.

83.     Philips expressly warranted, advertised, and represented to Plaintiff and the Class that the Recalled Devices were safe and appropriate for human use.

84.     Philips made these express warranties regarding the Recalled Devices' quality and fitness for use in writing through its website, advertisements, and marketing materials, and on the Recalled Devices' packaging and labels.

85.     These express warranties became part of the basis of the bargain that Plaintiff and the Class entered into upon purchasing the Recalled Devices.

86.     Philips' advertisements, warranties, representations, and omissions regarding health risks associated with the Recalled Devices, were made in connection with the sale of the Recalled Devices to Plaintiff and the Class.

87.     Plaintiff and the Class relied on Philips' advertisements, warranties, representations, and omissions regarding the Recalled Devices in deciding whether to purchase and use Philips' Recalled Devices.

88.     Philips' Recalled Devices do not conform to Philips' advertisements, warranties, representations, and omissions in that they are not safe, healthy, and appropriate for human use, and pose risks of serious injury and disease, including organ failure and cancer.

89.     Philips therefore breached its express warranties by placing Recalled Devices into the stream of commerce and selling them to consumers, when their use posed health risks, had dangerous effects and were unsafe, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Philips.

90.     These associated health effects substantially impair the use, value, safety of the Recalled Devices, and render them worthless.

91.     Philips was aware, or should have been aware, of the toxic or dangerous health effects of the use of the Recalled Devices, but nowhere on the package labeling or package inserts or on Philips' websites or other marketing materials did Philips warn Plaintiff and members of the Class that they were at risk of developing adverse health effects as a result of the dangerous PE-PUR Foam used in the Recalled Devices.

92.     Instead, Philips concealed the dangerous health effects of the PE-PUR Foam used in the Recalled Devices and deceptively represented that these products were safe, healthy, and appropriate for use.

93.     Philips thus utterly failed to ensure that the material representations they were making to consumers were true.

94.    The adverse health effects associated with use of the Recalled Devices existed when they left Philips' possession or control and were sold to Plaintiff and members of the Class. The dangers associated with use of the Recalled Devices were undiscoverable by Plaintiff and members of the Class at the time of purchase of the Recalled Devices.

95.    As manufacturers, marketers, advertisers, distributors and sellers of the Recalled Devices, Philips had exclusive knowledge and notice of the fact that the Recalled Devices did not conform to the affirmations of fact and promises.

96.    In addition, or in the alternative, to the formation of an express contract, Philips made each of the above-described representations and omissions to induce Plaintiff and members of the Class to rely on such representations and omissions.

97.    Philips' affirmations of fact and promises and its omissions were material, and Plaintiff and members of the Class reasonably relied upon such representations and omissions in purchasing and using the Recalled Devices.

98.    All conditions precedent to Philips' liability for its breach of express warranty have been performed by Plaintiff or members of the Class.

99.    Affording Philips an opportunity to cure its breaches of written warranties would be unnecessary and futile here.

100.    Philips was placed on reasonable notice from user reports and its lab testing that the PE-PUR Foam in the Recalled Devices was unsafe.

101.    Philips had ample opportunity either to stop using the PE-PUR Foam or to replace the PE-PUR Foam in the Recalled Devices to make them safe and healthy for use by Plaintiff and members of the Class, but failed to do so until now.

102.    As a direct and proximate result of Philips' breaches of express warranty, Plaintiff and members of the Class have been damaged because they did not receive the products as specifically warranted by Philips.

103.    Plaintiff and members of the Class did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for the Recalled Devices.

104.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their express warranties and resulting breach.

105.    Regarding the injunctive and declaratory relief sought, specifically Plaintiff and the Class seek the immediate replacement of the Recalled Devices and court-supervised medical monitoring in order to detect damage caused by the Recalled Devices to Plaintiff and the Class.

**COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

106.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

107.    Philips are merchants engaging in the sale of goods to Plaintiff and the Class.

108.    There was a sale of goods from Philips to Plaintiff and the Class.

109.    At all times mentioned herein, Philips manufactured or supplied the Recalled Devices, and prior to the time the Recalled Devices were purchased by Plaintiff and the Class, Philips impliedly warranted to them that the Recalled Devices were of merchantable quality, fit for their ordinary use, and conformed to the promises and affirmations of fact and omissions made on the Recalled Devices' labels and packaging, including that the Recalled Devices were safe and appropriate for human use.

110.    Plaintiff and the Class relied on Philips' promises and affirmations of fact and omissions when they purchased and used the Recalled Devices.

111.    Contrary to these representations and warranties, the Recalled Devices were not fit for their ordinary use and did not conform to Philips' affirmations of fact and promises and omissions because use of the Recalled Devices is accompanied by the risk of adverse health effects, which does not conform to the labels and packaging of these devices.

112.    Philips breached its implied warranties by selling Recalled Devices that failed to conform to the promises or affirmations of fact made on the packaging or label, as use of each Recalled Devices was accompanied by the risk of developing adverse health effects that do not conform to the packaging or label.

113.    Philips was on notice of this breach, as it was made aware of the adverse health effects accompanying use of the Recalled Devices through user reports submitted to Philips and through lab testing.

114.    Privity exists because Philips impliedly warranted to Plaintiff and the Class through the warranting, packaging, advertising, marketing, and labeling that the Recalled Devices were natural, and suitable for use to treat health conditions, and made no mention of the attendant health risks associated with use of the Recalled Devices.

115.    As a direct and proximate result of Philips' conduct, Plaintiff and the Class have suffered actual damages in that each Recalled Device they purchased is worth less than the price they paid and which they would not have purchased at all had they known of the attendant health risks associated with the use of each Recalled Device.

116.     Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their implied warranties and resulting breach.

117.     Regarding the injunctive and declaratory relief sought, specifically Plaintiff and the Class seek the immediate replacement of the Recalled Devices and court-supervised medical monitoring in order to detect damage caused by the Recalled Devices to Plaintiff and the Class.

## COUNT III
## FRAUDULENT MISREPRESENTATION

118.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

119.     Philips failed to advise Plaintiff and the Class that the Recalled Devices posed serious health risks to their users and Philips falsely represented to Plaintiff and the Class that the Recalled Devices were safe for human use.

120.     Philips intentionally, knowingly, and recklessly made these misrepresentations and omissions to induce Plaintiff and the Class to purchase the Recalled Devices.

121.     Philips knew that its representations and omissions about the Recalled Devices were false in that the Recalled Devices contained PE-PUR Foam and thus were at risk of causing adverse health effects to users of the Recalled Devices, which does not conform to the products' labels, packaging, advertising, and statements.

122.     Philips knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Class.

123.     Plaintiff and the Class did in fact rely on these omissions and misrepresentations and purchased and used the Recalled Devices to their detriment.

124. Given the deceptive manner in which Philips advertised, represented, and otherwise promoted the Recalled Devices, Plaintiff's and the Class's reliance on Philips' omissions and misrepresentations was justifiable.

125. As a direct and proximate result of Philips' conduct, Plaintiff and the Class have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known of the health risks, including organ failure and cancer, associated with the use of the Recalled Devices, and (c) which did not conform to the Recalled Devices' labels, packaging, advertising, and statements.

126. Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

127. Regarding the injunctive and declaratory relief sought, specifically Plaintiff and the Class seek the immediate replacement of the Recalled Devices and court-supervised medical monitoring in order to detect damage caused by the Recalled Devices to Plaintiff and the Class.

**COUNT IV**
**FRAUD BY OMISSION**

128. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

129. Philips concealed from and failed to disclose to Plaintiff and the Class that use of Recalled Devices is accompanied by a risk of adverse health effects, which does not conform to the products' labels, packaging, advertising, and statements.

130. Philips was under a duty to disclose to Plaintiff and the Class the true quality, characteristics, ingredients and suitability of the Recalled Devices because: (a) Philips was in a superior position to know the true state of facts about its products; (b) Philips was in a superior position to know the risks associated with the use of, characteristics of, and suitability of the

Recalled Devices for use by individuals; and (c) Philips knew that Plaintiff and the Class could not reasonably have been expected to learn or discover prior to purchasing the Recalled Devices that there were misrepresentations and omissions by Philips in the packaging, labels, advertising, and websites regarding the health risks associated with use of these devices.

131.    The facts concealed or not disclosed by Philips to Plaintiff and the Class were material in that a reasonable consumer would have considered them important when deciding whether to purchase the Recalled Devices.

132.    Plaintiff and the Class justifiably relied on Philips' omissions to their detriment. The detriment is evident from the true quality, characteristics, and risk associated with the use of the Recalled Devices, which is inferior when compared to how the Recalled Devices are advertised and represented by Philips.

133.    As a direct and proximate result of Philips' conduct, Plaintiff and the Class have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known of the health risks associated with the use of the Recalled Devices, and (c) which do not conform to the Recalled Devices' labels, packaging, advertising, and statements.

134.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

135.    Regarding the injunctive and declaratory relief sought, specifically Plaintiff and the Class seek the immediate replacement of the Recalled Devices and court-supervised medical monitoring in order to detect damage caused by the Recalled Devices to Plaintiff and the Class.

**COUNT V**
**NEGLIGENT MISREPRESENTATION**

136.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

137.    Philips had a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, distribution, and sale of the Recalled Devices.

138.    Philips breached its duty to Plaintiff and the Class by developing, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiff and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Philips and by failing to promptly remove the Recalled Devices from the marketplace or to take other appropriate remedial action upon becoming aware of the health risks of the Recalled Devices.

139.    Philips knew or should have known that the qualities and characteristics of the Recalled Devices were not as advertised or suitable for their intended use and were otherwise not as warranted and represented by Philips.

140.    Specifically, Philips knew or should have known that: (a) the use of the Recalled Devices was accompanied by risk of adverse health effects that do not conform to the packaging and labeling; (b) the Recalled Devices were adulterated, or at risk of being adulterated, by the PE-PUR Foam; and (c) the Recalled Devices were otherwise not as warranted and represented by Philips.

141.    As a direct and proximate result of Philips' conduct, Plaintiff and the Class have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known they contained PE-PUR Foam that could cause users of the Recalled Devices to suffer adverse health effects, and (c) which do not conform to the products' labels, packaging, advertising, and statements.

142.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

143.    Regarding the injunctive and declaratory relief sought, specifically Plaintiff and the Class seek the immediate replacement of the Recalled Devices and court-supervised medical monitoring in order to detect damage caused by the Recalled Devices to Plaintiff and the Class.

## COUNT VI
## UNJUST ENRICHMENT

144.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

145.    Plaintiff and the Class conferred substantial benefits on Philips through their purchase of the Recalled Devices.

146.    Philips knowingly and willingly accepted and enjoyed these benefits.

147.    Philips either knew or should have known that the payments rendered by Plaintiff and the Class were given with the expectation that the Recalled Devices would have the qualities, characteristics, and suitability for use represented and warranted by Philips.

148.    As such, it would be inequitable for Philips to retain the benefit of the payments under these circumstances.

149.    Philips' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Philips to retain the benefits without payment of the value to Plaintiff and the Class.

150.    Plaintiff and the Class are entitled to recover from Philips all amounts wrongfully collected and improperly retained by Philips, plus interest thereon.

151.    Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

152.     Regarding the injunctive and declaratory relief sought, specifically Plaintiff and the Class seek the immediate replacement of the Recalled Devices and court-supervised medical monitoring in order to detect damage caused by the Recalled Devices to Plaintiff and the Class.

**COUNT VI**
**PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 Pa. Stat. § 201-1, *et seq.***

153.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

154.     Plaintiff and Philips are persons, the Recalled Devices are goods purchased for personal, family, and/or household use, and Philips' conduct described herein is trade or commerce under the UTPCPL. 73 Pa. Stat. § 201-2(2)-(3), 201-9.2.

155.     For the reasons discussed herein, Philips violated and continues to violate the UTCPL by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by UTCPL §§ 201-1, *et seq*.

156.     Philips' acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

157.     Philips repeatedly advertised on the labels and packing for the Recalled Devices, on Philips' websites, and through national advertising campaigns, among other items, that the Recalled Devices were safe and fit for human use.

158.     Philips failed to disclose the material information that the PE-PUR Foam used in the Recalled Devices, and therefore the Recalled Devices themselves, were unsafe and unfit for human use.

159.    Philips' representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase and use the Recalled Devices without being aware that the PE-PUR Foam used in the Recalled Devices, and therefore the Recalled Devices themselves, were unsafe and unfit for human use.

160.    As a direct and proximate result of Philips' unfair and deceptive acts or practices, Plaintiff and the Class suffered damages by purchasing the Recalled Devices because they would not have purchased the Recalled Devices had they known the truth, and they received a product that was worthless because it contains unsafe PEPUR Foam which can cause a number of adverse health effects, including organ failure and cancer.

161.    Philips' deceptive trade practices caused injury in fact and actual damages to Plaintiff and members of the Class in the form of the loss or diminishment of value of the Recalled Devices that Plaintiff and Class Members purchased, which allowed Philips to profit at the expense of Plaintiff and Class Members.

162.    The injuries Plaintiff and Class Members sustained were to legally protected interests.

163.    The gravity of the harm of Philips' actions is significant and there is no corresponding benefit to consumers of such conduct.

164.    Plaintiff and Class Members seek relief for the injuries they have suffered as a result of Philips' unfair and deceptive acts and practices, as provided by 73 Pa. Cons. Stat. Ann. § 201-9.2 and applicable law.

## COUNT VII
## MEDICAL MONITORING

165.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

166.    At all relevant times, the Philips designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed the Recalled Devices into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff and the Class.

167.    Philips has reported that users of the Recalled Devices face risks of serious injury from the degradation of PE-PUR Foam contained in the Recalled Devices. Degradation of PE-PUR Foam may be caused by exposure to chemical emissions from the foam material, high heat and high humidity environments in certain regions, and cleaning methods such as ozone may accelerate potential degradation.

168.    When PE-PUR Foam degrades into particles that may enter the device's pathway and be ingested or inhaled by users of the devices, users face significantly increased risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment.

169.    The potential risks of degraded foam exposure include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects.

170.    The off-gassing of chemicals from the PE-PUR Foam contained in the Recalled Devices poses risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment.

171.    The potential risks of exposure to off-gassing from PE-PUR Foam include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

172.    The absence of visible particles does not mean that PE-PUR Foam breakdown has not already begun. Philips has reported that lab analysis of the degraded foam reveals the presence of harmful chemicals including: TDA, TDI, and DEG.[14]

173.    TDI is a powerful irritant to the mucous membranes of the eyes and gastrointestinal and respiratory tracts,[15] and has been reported to cause Occupational Asthma.[16]

174.    Exposure to TDA may result in ataxia, tachycardia, nausea, vomiting, convulsions, and respiratory depression.[17]

---

[14] Philips Sleep and Respiratory Care Update; Clinical information for physicians, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (last visited Aug. 2, 2021).

[15] The National Institute for Occupational Safety and Health (NIOSH) Current Intelligence Bulletin 53, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*, DHHS (NIOSH) Publication Number 90-101 (Dec. 1989); *see also* Gunnar Skarping, *et al.*, *Biological monitoring of isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate*, Dep't of Occupational and Environmental Medicine, University Hospital, S-221 85 Lund, Sweden (1990); https://greenfuture.io/sustainable-living/spray-polyurethane-foam-toxic/ (last visited Aug. 2, 2021).

[16] Bernstein, David I, *Occupational asthma: Definitions, epidemiology, causes, and risk factors*, Wolters Kluwer, https://www.uptodate.com/contents/occupational-asthma-definitions-epidemiology-causes-and-risk-factors/print (last visited Aug. 2, 2021).

[17] NIOSH, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*; *see also* Skarping, *Biological monitoring of isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate*; https://greenfuture.io/sustainable-living/spray-polyurethane-foam-toxic/ (last visited Aug. 2, 2021).

175.    TDA can cause chemical cyanosis (*i.e.*, bluish discoloration of the skin) by converting hemoglobin to methemoglobin. This compound can also cause fatty degeneration of the liver.[18]

176.    TDA and TDI are potential carcinogens.[19]

177.    Repeated exposure to DEG has been associated with damage to the kidneys and renal failure.[20]

178.    As a direct and proximate result of Philips' conduct, Plaintiff and the Class have been exposed to substantially increased risks of serious injury from off-gassing and/or degradation of PE-PUR Foam in the Recalled Devices, which is beyond normal background levels of risk.

179.    As a direct and proximate result of Philips' conduct, Plaintiff and the Class have a significantly increased risk of suffering serious injury or contracting a serious latent disease, and suffering further injury at an unknown date in the future.

180.    Such injuries include cancer and organ failure, among others currently unknown or just being discovered.

---

[18] *Id.*

[19] *Id.* ("The excess cancer risk for workers exposed to TDI and TDA has not yet been quantified, but the probability of developing cancer should be decreased by minimizing exposure.").

[20] Greg M. Landry, *Diethylene glycol-induced toxicities show marked threshold dose response in rats*, Toxicology and Applied Pharmacology 282 (2015) 244-251 ("DEG has recently been involved in several mass epidemics of renal failure and death world-wide (O'Brien et al., 1998; Schier et al., 2013). DEG poisoning clinically manifests in metabolic acidosis, hepatotoxicity, renal failure, and peripheral neuropathy, with the hallmark being acute renal failure involving proximal tubule cell necrosis and cortical degeneration (Schep et al., 2009)"); Cohen, Jeffrey A., *Demyelinating Diseases of the Peripheral Nerves*, Nerves and Nerve Injuries (2015) ("When consumed, DEG causes severe systemic and neurologic complications, including coma, seizures, peripheral neuropathy, and hepatorenal failure.").

181.    Monitoring procedures exist that makes the early detection of damage from degraded and/or off-gassed PE-PUR Foam possible.

182.    These procedures are different from that normally recommended in the absence of the exposure.

183.    These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

184.    Existing medical research indicates that exposure to TDI, TDA, and DEG, which Philips has found to exist in off-gassed or degraded PE-PUR Foam, can cause serious, life-threatening and permanent injuries.

185.    Philips has received reports from users of the Recalled Devices of headache, upper airway irritation, cough, chest pressure and sinus infection.

186.    The exposure to the defects inherent in the Recalled Devices has occurred for users, such as Plaintiff and the Class, but the full extent of the injuries will not manifest until later in their lives.

187.    Thus, because of Philips' conduct, it is reasonably necessary that Plaintiff and the Class be placed under period diagnostic testing beyond that normally recommended in the absence of use of the Recalled Devices.

188.    Plaintiff demands judgment against Philips for medical monitoring damages to diagnose injuries caused by the Recalled Devices at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

189.    Plaintiff also demands injunctive and declaratory relief, including the immediate replacement of the Recalled Devices and court-supervised medical monitoring as stated herein to detect damage caused by the Recalled Devices to Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, pray for judgment against Philips as to each and every count, including:

A.    An order certifying this action as a class action, certify the proposed Class, designating Plaintiff as representative of the Class, and appointing Plaintiff's counsel as counsel to the Class;

B.    An order declaring that Philips' actions constitute: (1) breach of express warranty; (2) breach of the implied warranty of merchantability; (3) fraudulent misrepresentation; (4) fraud by omission; (5) negligent misrepresentation; (6) unjust enrichment; and (7) unfair and deceptive business practices in violation of Pennsylvania's UTPCPL, and that Philips is liable to Plaintiff and the Class, as described herein, for damages arising therefrom;

C.    An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Philips from continuing the unlawful practices alleged herein, immediate replacement of the Recalled Devices, court-supervised medical monitoring to detect damage caused by the Recalled Devices to Plaintiff and the Class, and injunctive relief necessary to remedy Philips' past conduct;

D.    A judgment awarding Plaintiff and members of the Class all appropriate damages in an amount to be determined at trial;

E.      A judgment awarding equitable, injunctive, and/or declaratory relief as may be appropriate;

F.      A judgment awarding Plaintiff and the Class medical monitoring damages;

G.      A judgment awarding Plaintiff and the Class prejudgment and post-judgment interest, as permitted by law;

H.      A judgment awarding Plaintiff and the Class costs and fees, including attorneys' fees, as permitted by law; and

I.      Grant such other legal, equitable or further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully Submitted,

Dated: September 16, 2021

*/s/ Kevin W. Tucker*

Kevin W. Tucker (He/Him) (PA 312144)
Kevin J. Abramowicz (He/Him) (PA 320659)
Chandler Steiger (She/Her) (PA 328891)
Stephanie Moore (She/Her) (PA 329447)
**EAST END TRIAL GROUP LLC**
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208
Tel. (412) 877-5220
Fax. (412) 626-7101
ktucker@eastendtrialgroup.com
kabramowicz@eastendtrialgroup.com
csteiger@eastendtrialgroup.com
smoore@eastendtrialgroup.com

*Counsel for Plaintiff*